## Case No. 6,997.

### The IDAHO.

[5 Ben. 280; [1] 14 Int. Rev. Rec. 134.]

District Court, E. D. New York. July 11, 1871. [2]

BILL OF LADING — COMMON CARRIER — FRAUD OF SHIPPER—MINGLING GOODS—DESPOILING EVIDENCE.

1. In April, 1869, at New Orleans, F. obtained a bona fide advance from W. J. P. & Co. on a bill of lading for 140 bales of cotton on the brig C. The cotton was not then on board the C. A few days afterwards, F. delivered it alongside of her, but before it was put on board, he removed it from her custody, and shipped it on the steamer L. for New York, with 25 other bales, taking one bill of lading for the whole, on which he got an advance from S. at New York, to whom he consigned the whole. The L. arrived at New York with the cotton, which was taken directly by S. to a warehouse, where S. caused the marks to be removed, and the bales re-marked with marks similar to marks on 35 other bales belonging to S., and the whole 200 were shipped in the steamship I. for Liverpool, the shipment being made in the name of third parties, who gave the receipts to M., a clerk of S., to whom a nominal sale had been effected. M. obtained from the I. a bill of lading for the cotton, and having made a nominal sale of the cotton to H. & Co., indorsed the bill of lading to J. F. & Co., of Liverpool, the agents of H. & Co. The steamship arrived at Liverpool, and delivered 35 of the bales to J. F. & Co., and delivered the other 165 to agents of W. J. P. & Co. H. & Co. filed a libel against the steamship, to recover for the failure to deliver the cotton as required by their bill of lading. *Held*, that, on the receipt of the 140 bales by the brig C., they became the property of W. J. P. & Co., and that the libellants had no better title to them than S., who had no title as against W. J. P. & Co.

[Cited in The Ferreri, 9 Fed. 471.]

2. The ship could prove this title of W. J. P. & Co., and a delivery to them of the cotton, as a defence against the claim of H. & Co.

3. As S. & Co. had mingled 25 bales of cotton of their own, with the 140 belonging to W. J. P. & Co., so that they could not be distinguished, the whole 165 became the property of W. J. P. & Co.

4. Everything is to be presumed against the despoiler of evidence.

In admiralty.

Emott, Hammond and Pomeroy, for libellants.

Owen, Nash & Gray and W. G. Choate, for claimants.

BENEDICT, District Judge. This is a proceeding in rem to recover of the steamship Idaho for the non-delivery of certain cotton, valued at some $25,000, which was shipped in that vessel on the 3d day of May, 1869, to be transported from New York to Liverpool.

The original shipment consisted of 200 bales, claimed to have been then owned by Thos. Man, who, on the day of the shipment, and before any bill of lading was is-

sued, sold the same to Hentz & Co., the libellants, free on board. The bill of lading contained the ordinary contract to deliver the goods to the order of Man as the shipper. It was signed on the 4th of May, and Man then indorsed on it a direction to deliver the goods to James Finlay & Co., who were agents of the libellants in Liverpool. The steamer duly performed her voyage, and delivered her cargo; but of this shipment of cotton, only 35 bales were delivered to James Finlay & Co.; the remaining 165 bales were delivered to Baring Bros., acting as agent of W. J. Porter & Co. For this failure to perform the contract in the bill of lading, the libellants now bring this action.

It is necessary here to state but one of the defences set up by the ship, which is, that neither Man, who received the bill of lading, nor the libellants, to whom it was transferred, were entitled to the cotton, but that it belonged to Porter & Co., and that the delivery to the true owner on his demand constitutes a defence to this action. The facts material to this issue are as follows:

In April, 1869, at New Orleans, W. J. Porter & Co., in due course of business and in good faith, advanced to one Forbes a large sum of money upon a bill of lading, which set forth a shipment of 140 bales of cotton at New Orleans in the brig C. C. Colson. The bill of lading was in the ordinary form, executed by the lawful master of the Colson, but, in fact, no such cotton had been shipped at the time of its execution. Some few days after the date of the bill of lading, and after the acceptance of the drafts by Porter & Co., Forbes did, however, ship by the Colson 140 bales of cotton, as and for the cotton described in the bill of lading sent to Porter & Co. This cotton was duly delivered to the Colson, was receipted for by the officers of the brig, and although not then placed on board, was delivered to the vessel on the wharf alongside, and, in my opinion, duly shipped, as cotton to be transported and delivered according to the bill of lading which the master had already signed.

By this shipment the title to the 140 bales so shipped passed to Porter & Co., who had advanced upon the faith of such a shipment, and held the bill of lading which set forth the shipment in question. 12 Pick. 314; Halliday v. Hamilton, 11 Wall. [78 U. S.] 560.

Subsequent to this shipment, and on the same day, before the cotton was taken into the hold of the brig, Forbes accomplished its removal from the custody of the brig, and its shipment on the steamship Lodona, lying near and bound for New York. The previous shipment of the cotton on the Colson was unknown to the officers of the Lodona, and they as of course issued bills of lading in the ordinary form for the cotton they received.

Forbes, it seems, shipped in the Lodona

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[2] [Affirmed in Case No. 6,998, and in 93 U. S. 575.]

25 other bales, and took one bill of lading for the whole 165, on which second bill of lading he obtained a large advance from the firm of Shaffer & Co., of New York, to whom he made a second assignment of the cotton.

An issue has been raised as to the identity of the cotton shipped in the Colson with that shipped on the Lodona. But the weight of the evidence is, that the same 140 bales delivered to the brig went to the Lodona, and were included in the bill of lading for 165 bales which was sent to Shaffer & Co. Were the direct evidence upon this point less conclusive than it is, I should still be of the same opinion, because of the dealing of Shaffer & Co. with the cotton after it was delivered to them from the Lodona in New York. It appears that the Lodona arrived in New York on the 29th or 30th of April. The 165 bales were taken directly to a warehouse by Shaffer & Co., who, on the 1st of May, engaged freight in the Idaho for 200 bales of cotton. On the same day, Saturday, Shaffer & Co. sent for one Corcoran, who went to Shaffer's house on Sunday, and was then directed, as he says, to remove all the marks and numbers from the 165 bales, and to re-mark them with marks similar to 35 other bales which Shaffer & Co. had stored in West street. Corcoran did this as well as the short time permitted, and on Monday, May 3d, the whole 200 bales—120 of them marked "S.A.L." and 80 marked "V.O.X."—were shipped in the Idaho. This shipment was not made in Shaffer's name, but while Corcoran was at work on the cotton, it was nominally sold to Man, a clerk of Shaffer's, and it was shipped in the name of Conklin & Davis, grocers, who permitted their names to be thus used, and indorsed the ship's receipts over to Man. On the 4th of May, Man applied for and received the bill of lading of the Idaho for the 200 bales on which this action is brought. Mr. Shaffer testifies, that on the 3d day of May a bill of sale of the cotton had been given to Man, which, however, is not produced, and it is clear on the evidence that any transfer to Man was merely nominal, for the purpose of obscuring the title of the cotton. On the same day Man sold the cotton to Hentz & Co. free on board, but this was also merely nominal. Hentz & Co. were told to ask no questions, and, on the 5th or 6th, gave their note for the cotton to Man, who paid it to Shaffer, who held it till maturity, and when Hentz & Co. paid the amount of it to Man, they obtained Shaffer's guaranty against loss. Man then paid the money over to Shaffer, who gave him a check for $897 36, as for a difference in price between the sales to Man and Man's sales to Hentz & Co.; and Hentz & Co. acted under the direction of Shaffer & Co. in bringing this suit.

The statement of these facts, with the additional one that Man, although alive and in New York, is not called as a witness, are sufficient to show the nature of the transaction; and the effort, together with the fact that a few of the original marks on the cotton, which, owing to the shortness of time, escaped Corcoran's knife, were still to be seen, affords support to the direct evidence of the witness who swears that the cotton, shipped on the Colson, was carted on his direction to the Lodona. Under such a state of facts, the presumption arises that the marks on the cotton, which arrived by the Lodona, would have proved its identity with that shipped on the Colson, otherwise why obliterate instead of carefully retaining them? Everything is to be presumed against the despoiler of evidence.

I find, therefore, as a question of fact, that the 140 bales of cotton shipped on the Colson, and transferred by bill of lading to Porter, formed part of the 165 bales received by Shaffer & Co. from the Lodona, and of the 200 bales shipped in the Idaho under the bill of lading on which this action is brought; and I find further, that the present libellants are at least chargeable with notice that they were dealing in respect to property, of which the title was in dispute. Indeed, the facts of the case, and the manner of the witnesses, satisfy me that Shaffer & Co. are the real parties in interest here. It is at any rate certain that the libellants title to the 140 bales is no better than Shaffer's, and Shaffer had no title as against Porter & Co., to whom the cotton had been shipped by the first bill of lading issued therefor by the master of the Colson.

I am thus brought to consider the question of law, which has been so earnestly discussed before me, and to determine whether the delivery of this cotton to Porter & Co., the real owners, is a good defence to the action of the libellants against this steamer.

In several cases, courts of common law have held, that a delivery by the carrier to the actual owner was a good defence to the action of a shipper, whose possession was acquired by fraud. Bates v. Stanton, 1 Duer, 85; Sheridan v. New Quay Co., 4 C. B. (N. S.) 618; 98 E. C. L. 618.

I am unable to discover any real ground of distinction in principle between the class of cases referred to, and the present case. Fraud has been an important fact in these cases, because when proved it showed the shipper to be without title to the property; but the same result should follow, if it be shown in any way that the shipper has no title. The defence has been sustained by the courts in such cases, not for the purpose of punishing fraud, but because by reason of the fraud the shipper acquired no right to the property.

The sense and justice of things would seem to be that goods, held by a carrier, should be delivered to him who owns them, and such a delivery protected by the courts. It certainly would not be equity to compel a

carrier to withhold goods in his possession from the actual owner, and deliver them to one not the owner, simply because one not the owner had shipped them. A court of admiralty is a court of equity. It administers the law so as to work justice and advance commerce, and is not bound by technical rules nor embarrassed by questions as to the forms of action. And no equity requires such a court.to hold, that the libellants can charge this steamer with this large sum, because she fails to deliver to them cotton, which, if it had been delivered to them, they could not have retained as against Porter & Co. who actually received it.

The libellants have sustained no damage by the nondelivery. Suppose no delivery of the cotton at all had been set up in this action, and the proceeds of the stipulation for value had been permitted to be paid into the registry under this very libel, it is doubtful whether the libellants could in that event have resisted successfully a petition by Porter & Co., that the value of the cotton be paid to them out of such proceeds, based on the facts here proved. I do not see why the claimants should be in a worse position, because they have undertaken to prove, and have proved Porter's right to the property. Another consideration has been urged, which seems to me entitled to weight, as bearing upon this question, which is, that every shipper of goods, by implication, warrants his right to ship the goods in the capacity which he assumes. Such a warranty is necessary for the ship, and accordingly a breach of it by the shipper may be set up in any action brought by him against the ship.

There are other general considerations, bearing upon the subject, sufficiently obvious indeed, but which may perhaps be mentioned. A rule which forbids a ship to dispute the title of a shipper, makes ships the unwilling but most convenient receivers of goods held by doubtful titles. It encourages holders of such property to endeavor to procure a title by the simple expedient of a shipment in a ship. It indicates a speedy and safe method of concealment for such goods, while in the country, and insures their prompt removal to foreign lands; and it places vessels, whose punctuality and dispatch have become indispensable to modern commerce, in positions of great embarrassment, against which they have no effective method of protecting themselves. The contrary rule works no injustice, for the burden of proof is upon the ship, and the lien, which by the maritime law attaches to her, always affords the shipper abundant security; and security for its value is all that the law is able to afford, in any case of disputed title to property of this description.

In accordance with these views, I must sustain the defence which the claimants have interposed. In the remarks which I have made, I have not intended to intimate that Messrs. Shaffer & Co. were in any way con-cerned with Forbes in his frauds. nor have I made it a ground of my decision. that they became a party to the fraud, by their subsequent acts in concealing the cotton in the way I have described. Shaffer & Co. undoubtedly advanced their money in good faith upon the bill of lading of the Lodona; but when they found a question raised as to their right to the cotton, they yielded to the temptation afforded by the rule which their advocate has sought to invoke; they obliterated the marks, mingled the bales with others, and caused its shipment in this steamer, in the hope thereby to place the cotton in a foreign port, where the bales could with difficulty be identified, and their right to it would be likely to pass challenge. In my opinion, they should take nothing by such action.

I have thus far treated this case, as if no other cotton was involved except the 140 bales shipped in the Colson. But the bill of lading, sued on, calls for 200 bales, of which only 35 have been delivered to James Finlay & Co.

The original transfer from Forbes to Porter & Co. was of 140 bales only. These bales had been marked and numbered before they were shipped on the Lodona, and with them, in the same bill of lading, were 25 bales, making the 165 bales consigned to Shaffer & Co. After Shaffer & Co. received the 165 bales, they so dealt with the marks, as to make it impossible to identify the 25 bales, which were added by Forbes to the bales shipped by the Colson. They also afterwards added 35 other bales, from cotton of their own stored in West street, making the 200 bales; and all again were marked with new marks. Upon the arrival of the 200 bales in Liverpool, by an agreement between the consignees of Hentz & Co., the agents of Porter & Co. and the steamer's agent, the shipment was divided, and 165 delivered to Forbes, and 35 to Porter.

By that arrangement all parties are bound, and the delivery and acceptance of the 35 bales must be held to be a performance of the bill of lading. so far as that number of bales is concerned. The libellants claim further however, that in any event they are entitled to a decree for 25 bales, inasmuch as Porter's title, derived from the shipment of the cotton in the Colson, was confined to 140 bales. On the other hand, the claimants say that Porter demanded and received the whole 165 as his property, and that they have proved a state of facts which they insist, made him the owner of the whole 165 bales, which came by the Lodona. Here again, I must decide in favor of the claimants. The fact is unquestioned that Shaffer & Co. purposely mingled the bales to prevent identification. They had possession of the 200 bales for three or four days in New York, and their agent removed the marks. It would have been easy for them, to have maintained the difference in marks, which

existed when they received the cotton, and then easy for them to have pointed out, what bales, other than those from the Colson, were shipped on the Lodona; but they never attempted to do so; on the contrary, they have sought to make the confusion of marks work in support of their possession of the goods, and now insist here that the bales cannot be distinguished, and therefore they claim a decree for all.

But the law declares that one who intentionally mingles goods of his own with another's, for the purpose of concealment, and to prevent tracing the property, must lose the whole. The acts of Shaffer & Co., in regard to the 25 bales in question, must be followed with the consequence which the law attaches to such acts; and I must hold, that when the 140 bales shipped by the Colson, and the additional bales, were confused and mingled, as they were, to prevent any identification, the whole became the property of Porter & Co., and they thereby acquired the right to receive the 165 bales which were delivered them by the steamer.

The libellants must therefore fail to recover for any portion of the cotton delivered to Porter & Co. in Liverpool, and a decree must be entered, dismissing the libel with costs.

This case was affirmed by the circuit court on appeal [Case No. 6,998, and 93 U. S. 575].